Receipt number 9998-4126490

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED

AUG 11 2017

U.S. COURT OF
FEDERAL CLAIMS

|  |  |
|---|---|
| HEALTHNOW NEW YORK INC. | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| THE UNITED STATES OF AMERICA, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

Case No. **17-1090 C**

## COMPLAINT

Plaintiff HealthNow New York Inc. ("Plaintiff" or "HealthNow") brings this action against the United States Government ("Defendant" or "Government") seeking damages and other relief for the Defendant's (1) violation of Section 1342 of the Patient Protection and Affordable Care Act ("Section 1342") and 45 C.F.R. § 153.510(b) ("Section 153.510"); and (2) breach of its risk corridors payment obligations under an implied-in-fact contract. In support of this action, Plaintiff states and alleges as follows:

## NATURE OF ACTION

1. In March 2010, the Government enacted the Patient Protection and Affordable Care Act[1] and the Health Care and Education Reconciliation Act[2] (collectively the "Affordable Care Act" or the "Act" or "ACA").

2. The Act represented a major shift in healthcare regulation and coverage in the country. The ACA ushered in a host of market-wide reforms and requirements affecting the private health insurance industry. Among other things, the Act addressed the scope of covered

---

[1]  Pub. L. 111-148 (March 23, 2010), 124 Stat. 119.
[2]  Pub. L. 111-152 (March 30, 2010), 124 Stat. 1029.

services, availability of coverage, renewability of coverage, out-of-pocket costs for consumers, pricing, and other coverage determinants.  The Act limits health insurance product variation and restricts pricing and underwriting practices.  For example, by placing restrictions on the premium spread based on the age of the policy holder, the Act ensures that premiums are based on community rating (*i.e.*, the risk pool posed by the entire community) instead of an assessment of an individual's health status.  The Act also provides for guaranteed issuance of coverage and renewability of coverage.

3.     The ACA requires individuals to purchase coverage if they are not otherwise insured, and also created an elaborate scheme of federal subsidies to offset the cost of coverage. Another hallmark of the Act is its establishment of health insurance exchanges, which are online marketplaces where individuals and small groups may purchase health insurance.  The ACA's individual mandate, coupled with the availability of federal subsidies, dramatically increased the number of individuals—many previously uninsured—purchasing health insurance.  The health insurance exchanges were expressly "designed to bring together buyers and sellers of insurance, with the goal of increasing access to coverage" offered in a competitive marketplace.

4.     In order to facilitate affordability and access to competitive health insurance through the exchanges (also referred to as "marketplaces"), Congress encouraged health insurance issuers to offer qualified health plans in the individual and small group markets.  A qualified health plan ("QHP") is a health plan that meets certain standards established by the Centers for Medicare & Medicaid Services ("CMS") in order to be sold to consumers through the exchanges.

5.      Additionally, the ACA requires health plans in the individual and small group markets to cover essential health benefits ("EHBs").[3]  The EHBs are largely an expansion of what was covered pre-ACA.  Benefits previously subject to copays or other cost-sharing mechanisms are now mandated to be provided at no cost to the insured, which has made it difficult to predict utilization of these services.

6.      The health insurance exchanges presented a new and uncertain risk pool for health insurers.  Health insurers considering whether to participate in the exchanges had to confront the uncertainties of pricing health plans for new populations.  Insurers had neither sufficient data to accurately predict the needs of the newly insured individuals signing up for plans starting in 2014, nor a model to price with confidence these ACA plans to reflect the medical costs associated with this new and untested marketplace.

7.      To minimize the risks these uncertainties posed, the ACA featured three marketplace premium stabilization programs:  risk adjustment, reinsurance, and a temporary "risk corridors" program for each of the 2014, 2015, and 2016 benefit years (a "benefit year" is the calendar year for which a health plan provides coverage for health benefits).  The Risk Corridors Program ("RCP"), like the other two premium stabilization programs, were designed to limit the effects of adverse selection and to mitigate the uncertainty inherent in establishing rates for new, unquantifiable health insurance risks in the context of an untested regulatory framework.

---

[3]  EHBs include the following ten benefit categories:  (1) ambulatory patient services; (2) emergency services; (3) hospitalization; (4) maternity and newborn care; (5) mental health and substance use disorder services including behavioral health treatment; (6) prescription drugs; (7) rehabilitative and habilitative services and devices; (8) laboratory services; (9) preventive and wellness services and chronic disease management; and (10) pediatric services, including oral and vision care.

8.      The risk corridors program is required by statute to be modeled after a similar program enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act signed into law in 2003 (*i.e.*, Medicare Part D).  Medicare D is not budget neutral, a fact Congress was aware of when drafting Section 1342 of the ACA.

9.      Specifically, Section 1342 contains two related mandatory terms for all issuers of QHPs on an exchange:  (1) any health insurer selling a QHP on the exchange (a "QHP issuer") would receive compensation from the Government if its losses exceeded a certain defined amount due to high utilization and high medical costs; and (2) the QHP issuers would pay the Government a percentage of any gains they made in excess of similarly defined amounts.  The Act's framework thus compares "allowable costs" (essentially claims costs and adjustments for quality improvement activities, reinsurance, and risk adjustment charges or payments) with a "target amount" (the QHP's premium less its allocable administrative costs).  If the ratio of a QHP issuer's allowable costs to the target amount is greater than 1, it experiences losses; but if the ratio is less than 1, it experiences gains.

10.      The risk corridors program specifically guarantees that if an insurer's allowable costs "for any plan year" exceeded the target amount, the U.S. Department of Health & Human Services ("HHS"), CMS's parent agency, "shall pay to the plan" a portion of such excess allowable costs pursuant to the payment-calculation formula set forth in the ACA.  And, conversely, plans that incurred allowable costs below the target amount in the benefit year shall pay a portion of the differential to the Government.

11.      Under the text of Section 1342, the Government established an obligation to "pay" certain participating QHP insurers in accordance with the statutory payment formula at a later date.  This obligation was undefinitized (an unmatured commitment), in that payment was

not due until QHP issuers submitted their calculation of revenue and cost data to CMS so that the obligation could be definitized to a precise amount.  Section 1342 contained no other material steps or preconditions encumbering or permitting avoidance of CMS's statutory obligation to "pay" in accordance with the formula.

12.     Despite these express and binding obligations, the risk corridors program—like the ACA as a whole—was targeted by congressional opponents who sought to impede CMS's ability to administer the program as mandated by the ACA.  In particular, in the Consolidated and Further Continuing Appropriations Act of 2015 (Pub. L. No. 113-235) ("2015 Spending Law"), the Consolidated Appropriations Act, 2016 (Pub. L. No. 114-113) ("2016 Spending Law"), and the Consolidated Appropriations Act of 2017 (Pub. L. No. 115-31) ("2017 Spending Law," collectively, the "Spending Laws"), Congress prevented CMS and its parent agency, HHS, through appropriations riders, from using certain accounts to fund the obligated risk corridors payments.  Specifically, Congress prevented CMS from using the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, as well as funds transferred from other accounts funded by the Spending Laws to the CMS Program Management account for the applicable fiscal years.

13.     The practical effect of the Spending Laws was that CMS did not pay QHP issuers their full risk corridor receivable amounts due for 2014, 2015, and 2016.  During 2014, QHP issuers incurred almost $2.9 billion in losses that were compensable under the risk corridors program.  This amount is not disputed by HHS.  However, due to the 2015 Spending Law, over $2.5 billion of the mandatory risk corridor payments for 2014 were not paid.

14.     The QHP issuers on the whole incurred even greater compensable losses in 2015 in 2016 that CMS has not paid as a result of the Spending Laws.

15.     Nevertheless, Congress did not otherwise restrict availability of federal funds, and did not amend Section 1342 to limit, much less eliminate, the Government's risk corridors payment obligations to insurers under the ACA.

16.     Plaintiff HealthNow is a QHP issuer under the ACA.

17.     In 2014, 2015, and 2016 Plaintiff provided health insurance to its members on the state-based marketplace in New York.

18.     CMS has conceded that Plaintiff is owed $9,619,385.01 under the risk corridors program for its participation in the New York marketplace for benefit year 2015.  In addition, Plaintiff is owed $29,119,555 for its participating in the New York marketplace for 2016.

19.     To date, however, the Government has made no payment towards its benefit year 2015 payment obligations to HealthNow.  Moreover, CMS has stated publicly in sub-regulatory guidance that it will not make full payment under the risk corridors program until a later—but as-of-yet undetermined—date, if at all.

20.     By this lawsuit, Plaintiff seeks full payment of the amounts owed to it by the Government under the ACA for benefit years 2015 and 2016.  The law is clear, and the Government must abide by its statutory obligations.  Plaintiff respectfully asks the Court to compel the Government to do so.

## **JURISDICTION**

21.     This Court has jurisdiction over the subject matter of this action pursuant to the Tucker Act, 28 U.S.C. § 1491.  The statutory cause of action giving rise to this Court's Tucker Act jurisdiction is Section 1342, a money-mandating statute that requires payment from the federal government to QHP issuers, like Plaintiff, that satisfy certain criteria.  Section 153.510(b) is a money-mandating regulation that implements Section 1342 and thus also

obligates payment from the federal government to QHP issuers that satisfy certain criteria.

22.     In the alternative, the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101 *et seq.*, a money-mandating statute, provides Plaintiff a cause of action that gives rise to this Court's jurisdiction pursuant to the Tucker Act.

23.     This controversy is ripe because CMS has refused to pay Plaintiff the full amount Plaintiff is owed for 2015 and 2016 as required by Section 1342, Section 153.510, and the parties' implied-in-fact contract.

## PARTIES

24.     Plaintiff, HealthNow, is a corporation organized under the laws of New York, with its principal place of business in Buffalo, New York.

25.     HealthNow is a QHP issuer on the exchange in New York and offers comprehensive health insurance benefits to individuals, families, and businesses.

26.     In total, HealthNow provided insurance coverage to approximately 56,000 individuals on the exchanges in New York during benefit years 2014, 2015, and 2016.

27.     HealthNow has aggressively pursued the ACA's goal of connecting the people in its service area to insurance coverage opportunities with the understanding that a broader base of insured is better for the individuals and small groups within the pool and the overall functioning of the marketplaces.

28.     Defendant is the Government, acting at times through CMS (or CMS's parent agency HHS).  Unless otherwise noted, references in this Complaint to CMS include HHS where applicable.

## FACTUAL ALLEGATIONS

I.   **The Affordable Care Act Established a "Risk Corridors" Program With Two-Way Payment Obligations.**

29.    The Affordable Care Act established three insurance premium stabilization programs to address uncertainties in the marketplaces, commonly referred to as the "Three Rs": (1) a three-year risk corridors program; (2) a three-year reinsurance program; and (3) a permanent risk adjustment program.  Both the reinsurance and risk corridors programs began in 2014 and concluded at the end of 2016.

30.    Section 1342 of the Affordable Care Act, as codified at 42 U.S.C. § 18062, created the risk corridors program.  In relevant part that Section states:

> (a) IN GENERAL.—The Secretary *shall* establish and administer a program of risk corridors for calendar years 2014, 2015, and 2016 under which a qualified health plan offered in the individual or small group market *shall* participate in a payment adjustment system based on the ratio of the allowable costs of the plan to the plan's aggregate premiums. Such program *shall* be based on the program for regional participating provider organizations under part D of title XVIII of the Social Security Act.
>
> (b) PAYMENT METHODOLOGY.—
>
>> (1) PAYMENTS OUT.—The Secretary shall provide under the program established under subsection (a) that if—
>>
>>> (A) a participating plan's allowable costs *for any plan year* are more than 103 percent but not more than 108 of the target amount, the Secretary *shall pay to the plan* an amount equal to 50 percent of the target amount in excess of 103 percent of the target amount; and
>>>
>>> (B) a participating plan's allowable costs *for any plan year* are more than 108 percent of the target amount, the Secretary *shall pay to the plan* an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of the allowable costs in excess of 108 percent of the target amount.

Pub. L. No. 111-148, § 1342 (emphasis added).  Section 1342 also includes a provision dealing with "payments in," requiring QHP issuers to pay amounts to HHS if the plans' actual costs are

less than its targeted costs. *Id.* § 1342(b)(2). For both the "payments out" and "payments in" provisions, the terms "allowable costs" and "target amount" are defined by the statute. *Id.* § 1342(c).

31. HHS implemented the risk corridors program in the Code of Federal Regulations at 45 C.F.R. § 153.510. In relevant part, Section 153.510 states:

> (b) HHS payments to health insurance issuers. QHP issuers will receive payment from HHS in the following amounts, under the following circumstances:
>
>> (1) When a QHP's allowable costs ***for any benefit year*** are more than 103 percent but not more than 108 percent of the target amount, ***HHS will pay the QHP issuer*** an amount equal to 50 percent of the allowable costs in excess of 103 percent of the target amount; and
>>
>> (2) When a QHP's allowable costs ***for any benefit year*** are more than 108 percent of the target amount, ***HHS will pay to the QHP issuer*** an amount equal to the sum of 2.5 percent of the target amount plus 80 percent of allowable costs in excess of 108 percent of the target amount.

(Emphases added.)

32. This regulation and other regulations adopted by HHS further mandate certain data reporting requirements and deadlines applicable to the QHP issuers. 45 C.F.R. §§ 153.510, 153.530. Following verification by HHS of the QHP issuers' data submissions, HHS is required to pay the insurers based on their plans' excess expenses (one amount for expenses greater than 103 percent and another amount for expenses greater than 108 percent of each QHP issuer's target amount).

33. The QHP issuers' and the Government's respective risk corridors payment obligations pursuant to Section 1342 are graphically depicted in the following chart from the American Academy of Actuaries:



34.     The purpose of the risk corridors program—in conjunction with the others of the Three Rs—was to induce health insurer participation in the health insurance exchanges by mitigating their risk of loss.  Congress recognized that this could only work effectively if the payment obligations were honored on an annual benefit or plan year basis.  The program would hardly be able to serve its purpose of risk mitigation if, after incurring potentially millions of dollars in unbudgeted expenditures over a plan year, QHP issuers could not timely collect the reimbursements owed to them by the Government pursuant to the statutory formula as soon as their plans' accounting for the preceding year was finalized by CMS establishing the amounts owed.

35.     Section 1342 does not establish a fund into which QHP issuers must make payments due or from which payments must be made under the risk corridors program, *i.e.*, the statute does not create a single account to service both payments in and payments out.  Nor does the statute provide that the risk corridors program must be budget neutral.  In other words, payments out are **not** subject to payments in, and vice versa.  The statute is clear that the Government will share in the losses for plans with higher-than-anticipated costs so that if,

hypothetically, all plans have higher-than-anticipated costs, the Government would need to make payments even though there would be no insurer payments coming in.  The program could not have been subject to budget neutrality for the reason stated in the preceding paragraph.  Had the program been cabined by budget neutrality requirements, the Government would have shared no risk of loss and the ACA would have failed to attract sufficient entrants into the marketplaces because the investment would have been deemed too risky from a business perspective.  HHS's timely and complete payment to plans under the risk corridors program is essential to realizing Congress's intent in the ACA that the program stabilizes premiums.

36.      Indeed, Section 1342 is expressly modeled for just that reason on the Medicare Part D program, which is also not required to be budget neutral.  *See* 42 C.F.R. § 423.336.

## II.   QHP Issuers Participated in Exchanges and Set Prices in Reliance on the Risk Corridors Program.

37.      HealthNow and other insurers entered onto the exchanges with the express understanding—based on the plain text of Section 1342—that if their allowable costs "for any *plan year*" exceeded the target amount, the Secretary "*shall pay to the plan*" the amounts set forth in the ACA.  The implementing regulations at 45 C.F.R. § 153.510 expressly reiterated this ACA requirement, stating that when a QHP's allowable costs "for any *benefit year*" exceeded the target amount, "*HHS will pay the QHP issuer*" the amounts set forth in the ACA.  The Government gave no indication at that time that it would subsequently refuse to pay its conceded risk corridors obligations, or hold payments due for a particular plan year until a later and indefinite date.

38.      Health insurers had relied on the statutorily mandated risk corridors program and commitment, as well as the other premium stabilization programs in setting their premiums for each year of the risk corridors program.  It was not until October 2015, long after health insurers

had set premiums for the last year of the RCP, that the Government first indicated that it would pay only 12.6 percent of its obligations under the risk corridors program for the 2014 benefit year.  CMS, "Risk Corridors Payment Proration Rate for 2014" (Oct. 1, 2015), *available at* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/RiskCorridorsPaymentProrationRatefor2014.pdf; CMS, "Risk Corridors Payment and Charge Amounts for Benefit Year 2014" (Nov. 19, 2015), *available at* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/RC-Issuer-level-Report.pdf ("2014 Payment Memo").  Similarly, it was not until September 2016 that CMS first indicated that it anticipated that "no funds would be available at this time for 2015 benefit year risk corridors payments."  CMS, "Risk Corridors Payments for 2015" (Sept. 9, 2016), *available at* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/Risk-Corridors-for-2015-FINAL.PDF ("Sept. 2016 Memo").  CMS then confirmed in November 2016 that it would not pay *any* portion of its obligations under the risk corridors program for the 2015 benefit year.  CMS, "Risk Corridors Payment and Charge Amounts for the 2015 Benefit Year" (Nov. 18, 2016), *available at* https://www.cms.gov/cciio/resources/regulations-and-guidance/downloads/2015-rc-issuer-level-report-11-18-16-final-v2.pdf ("2015 Payment Memo").  CMS has repeatedly indicated that it will not make full payment under the RCP.

### III.    The Risk Corridors Program is Contravened After Enactment.

39.    Since its enactment, Congress has not amended the RCP or the Government's obligations under the ACA's risk corridors program.  Despite this, the Government has frustrated the intended purpose of the program, *i.e.*, timely and complete payment to QHP issuers in order to satisfy the statutory agreement, to retain them in the marketplace and allow them to learn from and adapt to this uncharted new market.

40.     The first such step was in March 2014, when HHS unexpectedly took the position in sub-regulatory guidance that the risk corridors program would be self-funding or "budget-neutral."  Each spring, HHS publishes an annual rulemaking in which it articulates the payment policies and requirements for participation in the ACA marketplaces, the so-called annual Payment Rule. Specifically, in the preamble to the 2015 Payment Rule, and related guidance issued in April 2014, HHS indicated that it would attempt to administer the risk corridors program in a budget-neutral manner and would offset liabilities with future collections.

41.     The preamble to the 2015 Payment Rule, issued in March 2014, stated:

> [w]e intend to implement this program in a budget-neutral manner, and may make future adjustments, either upward or downward to this program (for example, as discussed below, we may modify the ceiling on allowable administrative costs) to the extent necessary to achieve this goal.

HHS Notice of Benefit and Payment Parameters for 2015, 79 Fed. Reg. 13,744, 13,787 (Mar. 11, 2014).

42.     Then, in April 2014, CMS issued a statement entitled "Risk Corridors and Budget Neutrality," asserting:

> if risk corridors collections are insufficient to make risk corridors payments for a year, all risk corridors payments for that year will be reduced pro rata to the extent of any shortfall. Risk corridors collections received for the next year will first be used to pay off the payment reductions issuers experienced in the previous year in a proportional manner, up to the point where issuers are reimbursed in full for the previous year, and will then be used to fund current year payments.

CMS, "Risk Corridors and Budget Neutrality" (Apr. 11, 2014), *available at* https://www.cms.gov/CCIIO/Resources/Fact-Sheets-and-FAQs/Downloads/faq-risk-corridors-04-11-2014.pdf ("April 2014 Memo").

43.     HHS never raised during the rulemaking on its Section 1342 implementing regulation (which was promulgated on March 23, 2012) that it would administer the risk

corridors program in a budget-neutral manner.  To the contrary, its aforementioned 2014

guidance radically departed from what the ACA intended and requires and what its

implementing regulation reflected:  the risk corridors program was enacted without regard to

annual budget neutrality.  Indeed, in its 2014 Payment Rule, issued March 11, 2013, HHS

conceded as much, stating that "[t]he risk corridors program is not statutorily required to be

budget neutral."  HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15,410,

15,473 (Mar. 11, 2013).  Further, Congress stated expressly in Section 1342 that the risk

corridors program was to be "based on" the Medicare Part D risk mitigation program, which is

not budget neutral.  *See* GAO, Report 15-447 (April 2015) at 14, *available at*

http://www.gao.gov/assets/680/670161.pdf  ("For the Medicare Advantage and Medicare Part D

risk mitigation programs, the payments that CMS makes to issuers are not limited to issuer

contributions.").

     44.    In short, the Government announced by unsupportable agency fiat in the spring of

2014 that it would aspire to administer the risk corridors program in a budget-neutral manner

notwithstanding the lack of any statutory basis for doing so, and then reiterated that position for

years 2015 and 2016, pointing to the April 11, 2014 "FAQ" on Risk Corridors and Budget

Neutrality, and suggesting that any decision on how the Government would make QHP issuers

whole under the risk corridors programs would be left to some indeterminate later day.

     45.    The Government's budget neutrality approach is not supported by law.  Neither

Section 1342 nor Section 153.510 provides that the risk corridors payments will come from the

pot of payments made to the Government by other insurers (*i.e.*, payments in).  Nor does either

provision contemplate permitting the Government to postpone payments that are owed until the

following year's collections are accounted for (or, as it seems might be the case should recent

post-hoc positions by HHS have its way, some indeterminate date in the future, if at all).

46.     On November 19, 2015, Defendant stated that, "HHS is recording ***those amounts that remain unpaid*** following our 12.6 percent payment this winter ***as a fiscal year 2015 obligation of the United States Government for which full payment is required***."  CMS, Risk Corridors Payments for the 2014 Benefit Year (Nov. 19, 2015) (emphasis added).  Through this official statement, the agency *conceded* that the Government incurred an unmatured "obligation" to make "full payment" and expressly recognized that paying less than the full calculated amount to each QHP issuer did not discharge its obligation ("those amounts that remain unpaid . . . for which full payment is required").  This statement contained an implied assurance to pay the remaining (owed) amount in the future.

**IV.     Congress Refused to Appropriate Funds for the Risk Corridors Program.**

47.     Beginning with the change in control of the U.S. House of Representatives in 2011, some of the ACA's opponents explored ways to undermine the law.  In particular, in the Spending Laws, Congress prevented CMS and HHS from using certain accounts to fund the obligated risk corridors payments through appropriations riders.  Specifically, Congress prevented CMS from using the Federal Hospital Insurance Trust Fund or the Federal Supplemental Medical Insurance Trust Fund, as well as funds transferred from other accounts funded by the Spending Laws to the CMS Program Management account for fiscal years 2015, 2016, and 2017.

48.     The QHP issuers on the whole incurred almost $2.9 billion in losses that the Government was required to reimburse under Section 1342.  Over $2.5 billion of that mandatory amount was not paid due to the 2015 Spending Law.

49.     The QHP issuers on the whole incurred even greater compensable losses in 2015 and 2016 that CMS has not paid, and will not pay, as a result of the 2016 and 2017 Spending

Laws.  The 2015 Spending Law's prohibition on the use of certain funds did not eliminate the use of all funds in the CMS Program Management account, such as fees received by HHS for the federally facilitated exchanges.  It also did not apply to years other than the fiscal year ending September 30, 2015.  Most notably, Congress *did not amend Section 1342 to require budget neutrality or to alter the underlying risk corridors obligations of the Government.*

50.     Moreover, the 2015 Spending Law was enacted on December 16, 2014, nearly a year after Plaintiff began offering insurance on the newly reformed and ACA-compliant New York exchanges and approximately 18 months after it had submitted rates for regulatory approval.  Faced with this new development, Plaintiff continued to abide by its obligations to the Government and its insured participants.

51.     In December 2015, Congress passed the 2016 Spending Law.  As in the 2015 Spending Law, the 2016 Spending Law prohibited CMS from using trust funds and other accounts for the fiscal year ending September 30, 2016 to fund risk corridors payments.  But, like the 2015 Spending Law, *it did not amend Section 1342 to require budget neutrality or alter the underlying risk corridors obligations of the Government*.

52.     On September 9, 2016, CMS issued a memorandum reiterating the agency's understanding that the Government owed "full" payment to insurers.[4]  That memorandum was followed by testimony of CMS Acting Administrator Andrew Slavitt before the House Energy and Commerce Committee on September 14, 2016.  Among other things, Mr. Slavitt stated without equivocation in response to a question posed by Representative Morgan Griffith that, notwithstanding the lack of an appropriation to fund the payments due insurers under Section

---

[4]  CMS, "Risk Corridors Payments for 2015" (Sept. 9, 2016), *available at* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/Risk-Corridors-for-2015-FINAL.PDF.

1342, it was "*an obligation of the federal government*" to remit full payment to insurers.[5]

53.     In a letter dated September 20, 2016 to HHS Secretary Sylvia Burwell, the leadership of the House Energy and Commerce Committee took issue with the positions expressed by CMS and Acting Administrator Slavitt, and demanded production by CMS of certain information and documents, including, among other things, the basis for CMS's viewpoint that the Government is obligated "to make insurers whole," the names of agency officials involved in discussions with Department of Justice about "risk corridors" litigation (such as the case at bar), and CMS's position on the use of the Judgment Fund to settle the Government's Section 1342 obligations.[6]

54.     The letter to Secretary Burwell was followed by letters sent by the same House Committee on or around October 4, 2016 to the chief executives of each of the QHP issuers that had, as of that date, filed complaints against the Government in the Court of Federal Claims seeking recovery of the risk corridors payments owed to them.

55.     In May 2017, Congress passed the 2017 Spending Law prohibiting CMS from using trust funds and other accounts to fund risk corridors payments for the fiscal year ending September 30, 2017.  But, like the other Spending Laws, *it did not amend Section 1342 to require budget neutrality or alter the underlying risk corridors obligations of the Government*.

## V.     Plaintiff Has Suffered Substantial Harm as a Result of the Government's Refusal to Pay Amounts Owed.

56.     Section 1342 of the ACA requires the Government to reimburse HealthNow for a

---

[5]  *See* Press Release, The Energy and Commerce Committee, Obamacare Insurance Bailout Scheme (Sept. 20, 2016), *available at* https://energycommerce.house.gov/news-center/press-releases/ec-leaders-press-administration-lawsuit-scheme-circumvent-congress-and.

[6]  House of Representatives & Committee on Energy and Commerce, Letter to the Honorable Sylvia Burwell (Sept. 20, 2016), *available at* https://energycommerce.house.gov/sites/republicans.energycommerce.house.gov/files/documents/114/letters/20160920HHS.pdf.

percentage of its higher-than-expected allowable costs incurred as a result of its participation in the marketplaces pursuant to the statutory formula, just as Section 1342 requires HealthNow or any other QHP issuer to pay CMS a percentage of realized lower-than-expected allowable costs. To date, however, CMS has stated publicly in sub-regulatory guidance that it will not make full payment under the RCP.  In addition, in public court filings the Government has asserted that it has no obligation to make risk corridor payments in excess of collections.  *E.g.*, Def.'s Mot. Dismiss and Opp. to Pl.'s Mot. Partial Summ. J. 8-10, 31, *Montana Health CO-OP v. United States*, No. 16-1427C (Fed. Cl. Jan. 10, 2017), ECF No. 17.

57.     On November 18, 2016, CMS conceded that as a result of the RCP, it owes HealthNow $9,619,385.01 under the risk corridors program as a result of higher-than-expected allowable costs in the individual and small group market.  On July 31, 2017, HealthNow submitted to HHS all data required by the ACA demonstrating that HealthNow experienced higher-than-expected allowable costs under the RCP for benefit year 2016, entitling HealthNow to payment by HHS in the amount of $29,119,555 (as calculated pursuant to the formula prescribed in ACA Section 1342, the same methodology HealthNow used to submit its 2014 and 2015 data, which has been validated by CMS).  To date, CMS has paid no portion of the full amount CMS concedes that it owes to HealthNow for benefit year 2015.

## VI.     The Government Refuses to Pay Amounts It Owes Plaintiff For 2015 Risk Corridors Payments.

58.     In October 2013, Plaintiff and the New York State Department of Health fully executed a Health Benefit Exchange Contract for Plaintiff's participation as a QHP issuer in the New York marketplace.

59.     Consistent with CMS regulations, its agreement with the New York State Department of Health, and its policy, Plaintiff began selling QHPs to consumers in New York on

or about November 15, 2013, with coverage effective January 1, 2014.

60.     Plaintiff complied with its statutory requirements and submitted to HHS all data required by the ACA demonstrating that HealthNow experienced lower-than-expected allowable costs under the risk corridors program for benefit year 2014.  HealthNow thus owed HHS $5,236,811.41, and timely paid that amount.

61.     Similarly, for benefit year 2015, Plaintiff began selling QHPs to consumers in New York on or about November 15, 2014, with coverage effective January 1, 2015.

62.     Plaintiff complied with its statutory requirements and submitted to HHS all data required by the ACA demonstrating that HealthNow experienced higher-than-expected allowable costs under the risk corridors program for benefit year 2015, entitling HealthNow to payment by HHS in the amount of $9,619,385.01.

63.     HHS, however, has stated that it will not make payment as required by the ACA for benefit year 2015.  Similar to the 2015 Spending Law, the 2016 Spending Law prevents CMS and HHS from making risk corridors payments from certain funding sources.  As a result, HHS has indicated that it will continue to treat the risk corridors program as "budget neutral" (although there is no basis in the ACA for doing so), and will use any funds received from QHP issuers for the 2015 risk corridors results to first pay down the $2.5 billion shortfall from 2014.

**VII.   The Government Refuses to Pay Amounts It Owes Plaintiff For 2016 Risk Corridors Payments.**

64.     As for benefit year 2016, consistent with CMS regulations and its agreement with the New York State Department of Health, and its policy, Plaintiff began selling QHPs to consumers on and off those exchanges on or about November 15, 2015, with coverage effective January 1, 2016.

65.     As it did in relation to its 2014 and 2015 risk corridors payments, Plaintiff

complied with its statutory requirements and submitted to HHS all data required by the ACA

demonstrating that HealthNow experienced higher-than-expected allowable costs under the RCP

for benefit year 2016, entitling HealthNow to payment by HHS in the amount of $29,119,555.

66.     On information and belief, HHS has no intention of making full payment as

required by the ACA.  Similar to the prior Spending Laws, the 2017 Spending Law prevents

CMS and HHS from making risk corridors payments from certain funding sources.  HHS has not

modified its position that it will continue to treat the RCP as "budget neutral" (although there is

no basis in the ACA for doing so).

67.     Despite the clear statutory mandate and its own multiple admissions of its

obligations to the contrary, HHS has stated that it will not make timely and complete payment to

QHP issuers.

68.     HHS's refusal to pay the amounts that it owes HealthNow contradicts the express

language of Section 1342, which states that if a plan's allowable costs "for any *plan year*"

exceeds the target amount, the Secretary "***shall pay to the plan***" the amounts set forth in the

ACA.  The implementing regulations at 45 C.F.R § 153.510 expressly reiterate when a QHP's

allowable costs "for any *benefit year*" exceeded the target amount, "***HHS will pay the QHP***

***issuer***" the amounts set forth in the ACA.

69.     HHS stated that "[t]he risk corridors payments for program year 2014 [would] be

paid in late 2015.  The remaining 2014 risk corridors claims will be paid out of 2015 risk

corridors collections, and if necessary, 2016 collections."  2014 Payment Memo.  HHS

concluded that in the event of a shortfall for the 2016 program year, HHS "***will explore other***

***sources of funding for risk corridors payments, subject to the availability of appropriations***.

This includes working with Congress on the necessary funding for outstanding risk corridors

payments." *Id.* (Emphasis added).  HHS has, therefore, refused to pay an "obligation of the United States Government for which full payment is required," and seeks to leave its payment of this debt completely open-ended and unsatisfied.

70.     The Government, by refusing to meet its payment obligations under the risk corridors program in violation of Section 1342, abrogates its responsibility with respect to one of the key features of the ACA, *i.e.*, providing market-stabilization in the new exchanges.

71.     The Government's refusal to pay money due under the risk corridors program gives rise to significant financial difficulties for issuers.  HealthNow has established itself as a community leader in healthcare, and through its programs, enriched the lives of thousands of Americans.  Withholding risk corridors payments defeats the very purpose of the risk corridors program:  mitigation of the risk and obligations that QHP issuers like HealthNow are now assuming by providing adequate and affordable health coverage to all Americans, as desired by the ACA.  Withholding the payments violates both the letter and the spirit of the law.

*       *       *       *       *

72.     Regardless of HHS's statements that it will manage the risk corridors program in a "budget-neutral" manner, and regardless of the acts of subsequent Congresses to limit the availability of certain funds to make payments owed to QHP issuers under the risk corridors program, the fact remains that the obligations of the Government under the ACA risk corridors program *have never been amended.*  Section 1342 mandates payment to QHP issuers under certain conditions *without regard to budget neutrality*, and for the very purpose of stabilizing the market by mitigating annual losses of participating plans, a fact especially crucial for new entrants who relied on the promise of Congress that cost overruns would be partially mitigated through reimbursement.  Notwithstanding *subsequent* agency pronouncements, *made only after*

*QHP issuers such as HealthNow entered the market*, CMS's implementing regulation (Section 153.510) reflected the mandatory nature of the payments without regard to budget neutrality.

73.     Plaintiff relied upon the risk corridors program when it entered and participated in the ACA exchanges, and when it designed and priced its 2014, 2015, and 2016 plans.  At the end of benefit years 2015 and 2016, Plaintiff was *owed* money based on its participation in both the individual and small group markets.  These losses, in the amount of $9,619,385.01, are owed and presently due to Plaintiff under the express terms of Section 1342 of the ACA.  Similarly, the $29,119,555 losses sustained in the RCP for benefit year 2016[7] are owed and presently due to Plaintiff under the express terms of Section 1342 of the ACA.  By this lawsuit, Plaintiff seeks the immediate payment in full of risk corridors receivables, so that it can continue to offer affordable health insurance as contemplated by the ACA.

## CLAIMS FOR RELIEF

### COUNT I

### (Violation of Statutory and Regulatory Mandate to Make Payments)

74.     Plaintiff re-alleges and incorporates the above Paragraphs 1-73 as if fully set forth herein.

75.     As part of its obligations under Section 1342 of the ACA and its obligations under 45 C.F.R. § 153.510(b), the Government is required to pay any QHP issuer certain amounts exceeding the target costs they incurred in 2014, 2015, and 2016

76.     Plaintiff is a QHP issuer under the ACA and, based on its adherence to the ACA and its submission of allowable costs and target costs to CMS, satisfies the requirements for

_____

[7] HealthNow's 2016 RCP payment has been calculated pursuant to the formula prescribed in the ACA using the same methodology HealthNow applied to its 2014 and 2015 data, both of which have been validated by CMS.  HealthNow has therefore properly calculated its losses, documented them, and submitted them to CMS in accordance with the law.

payment from the United States under Section 1342 of the ACA and 45 C.F.R. § 153.510(b).

77.    The Government has failed, without justification, to discharge its obligation under Section 1342 of the ACA and 45 C.F.R. § 153.510(b), and has affirmatively stated that it will not do so.

78.    The Government's failure to provide timely payments to Plaintiff is a violation of Section 1342 of the ACA and 45 C.F.R. § 153.510(b), and Plaintiff and has been harmed by these failures.

## COUNT II

### (Breach of Implied-In-Fact Contract to Make Payments)

79.    Plaintiff re-alleges and incorporates by reference the above Paragraphs 1-78 as if fully set forth herein.

80.    Plaintiff entered into a valid implied-in-fact contract with the Government regarding the Government's obligation to make full and timely risk corridors payments to Plaintiff in exchange for Plaintiff's agreement to become a QHP issuer and participate in the New York exchange.

81.    Section 1342 of the ACA, HHS's implementing regulations (45 C.F.R. § 153.510), bilateral written and verbal agreements, and HHS's and CMS's repeated admissions regarding their obligation to make risk corridor payments were made or ratified by representatives of the Government, including, but not limited to Kevin Counihan, Director of Consumer Information and Insurance Oversight ("CCIIO") and CEO of the Health Insurance Marketplaces; Andrew Slavitt, Acting Administrator of CMS; and other CMS officials, all of whom who had actual authority sufficient to bind the Government.  Section 1342, CMS's implementing regulations, bilateral written and verbal agreements, and the repeated admissions

made or ratified by agency officials with authority to bind the Government constitute a clear and unambiguous offer by the Government to make full and timely risk corridor payments to health insurers, including Plaintiff, that agreed to participate as QHP issuers in the ACA marketplaces and were approved as certified QHP issuers by the Government at the Government's discretion. This offer evidences a clear intent by the Government to enter into a unilateral contract with Plaintiff.

82.     Plaintiff subsequently accepted the Government's unilateral offer by beginning performance.  Plaintiff agreed to become a QHP issuer, accepted the obligations, responsibilities, and conditions the Government imposed on QHP issuers under the ACA, *inter alia*, 45 C.F.R. §§ 153.10 *et seq.* and 155.10 *et seq.*, and proceeded to provide health insurance on the New York marketplace.  Plaintiff satisfied and complied with its obligations and conditions which existed under the implied-in-fact contract.

83.     The Government's agreement to make full and timely risk corridor payments was a significant factor material to Plaintiff's decision to participate in the marketplace.

84.     The parties' mutual intent to contract is further confirmed by the parties' conduct, performance, and statements following Plaintiff's acceptance of the Government's offer, including the Government's repeated assurances that full and timely risk corridor payments would be made and would not be subject to budget limitations.  *See, e.g.*, 78 Fed. Reg. 15,409, 15,473 (Mar. 11, 2013).

85.     The implied-in-fact contract was also supported by mutual consideration:  the risk corridors program's protection from uncertain risks and new market instability was a tangible and substantial benefit that significantly influenced Plaintiff's decision to agree to become a QHP issuer and participate in the New York marketplace.  Plaintiff, in turn, provided a tangible

and substantial benefit to the Government by committing to become a QHP issuer, complying with the obligations and conditions of being a QHP issuer as enumerated in the Health Benefit Exchange Contract, and participating in the New York marketplace.  This provided a clear benefit because adequate insurer participation was essential to the Government's ability to achieve its overarching goal of the ACA exchange programs—to guarantee the availability of affordable, high-quality health insurance coverage for all Americans by protecting consumers from increases in premiums due to health insurer uncertainty.

86.     The Government induced Plaintiff to participate in the New York marketplace for benefit year 2014 by including the risk corridors program in Section 1342 of the ACA and its implementing regulations, by which the Government committed to help protect health insurers financially against risk selection and market uncertainty.

87.     The Government repeatedly acknowledged its commitments to share risk with QHP issuers and its obligations to make full and timely risk corridors payments to qualifying QHP issuers through its conduct and statements to the public and to Plaintiff and other similarly situated QHP issuers, made or ratified by representatives of the Government who had express or implied actual authority to bind the Government.  *See, e.g.*, Patient Protection and Affordable Care Act; Standards Related to Reinsurance, Risk Corridors and Risk Adjustment, 77 Fed. Reg. 17,220, 17,238 (Mar. 23, 2012).

88.     The Government also induced Plaintiff to commit to the New York marketplace for benefit years 2015 and 2016 during and after HHS and CMS's announcement in 2014 of their intention to implement the risk corridors program in a budget neutral manner, by repeatedly giving assurances to QHP issuers, including Plaintiff, that risk corridors collections will be sufficient to cover all of the Government's risk corridors payments, and that QHP issuers will

receive full payments regardless of the collection amount.  *See, e.g.*, April 2014 Memo ("We anticipate that risk corridors collections ***will be sufficient*** to pay for all risk corridors payments.") (emphasis added); Exchange and Insurance Market Standards for 2015 and Beyond, 79 Fed. Reg. 30,240, 20,260 (May 27, 2015) ("***In the unlikely event of a shortfall*** for the 2015 program year, HHS recognizes that the Affordable Care Act requires the Secretary to make full payments to issuers.  In that event, ***HHS will use other sources of funding for the risk corridors payments***, subject to the availability of appropriations.") (emphases added); Sept. 2016 Memo ("As we have said previously, in the event of a shortfall for the 2016 benefit year, ***HHS will explore other sources of funding for risk corridors payments***, subject to the availability of appropriations.") (emphasis added).

89.    HHS and CMS acknowledged and published the full risk corridors payment amount of $9,619,385.01 that the Government concedes it owes Plaintiff for benefit year 2015. *See* 2015 Payment Memo.

90.    Under the same calculation validated by CMS for benefit years 2014 and 2015, CMS owes Plaintiff $29,119,555 for benefit year 2016.

91.    Because Plaintiff accepted the Government's unilateral offer by beginning performance in October 2013 (and again in October 2014 and October 2015), Congress's *subsequent* failure to appropriate sufficient funds for risk corridor payments in December 2014, December 2015 and May 2017, respectively, did not extinguish the Government's extant contractual obligation to make full and timely risk corridor payments to Plaintiff.  This contractual obligation survives and is enforceable regardless of whether the Court believes that the Spending Laws modified or repealed Section 1342 of the ACA.  Once the contract became binding, the Government was—and remains—liable to make full payment to Plaintiff, using the

Judgment Fund if necessary.  Plaintiff is entitled to full payment from the Judgment Fund of the $9,619,385.01 in 2015 risk corridors payments and $29,119,555 in 2016 risk corridors payments.

92.     The Government's failure to make full and timely risk corridor payments to Plaintiff is a material breach of the implied-in-fact contract, and Plaintiff has been damaged by this failure.  Plaintiff therefore brings a claim for damages of $38,738,940.01 against the Government founded upon the Government's violation of an implied-in-fact contract.

## PRAYER FOR RELIEF

Plaintiff requests the following relief:

A.     That the Court award Plaintiff monetary relief in the amounts to which Plaintiff is entitled under Section 1342 of the Affordable Care Act and 45 C.F.R. § 153.510(b): $9,619,385.01 (for benefit year 2015) and $29,119,555 (for benefit year 2016).

B.     That the Court award pre-judgment and post-judgment interest at the maximum rate permitted under the law;

C.     That the Court award such court costs, litigation expenses, and attorneys' fees as are available under applicable law; and

D.     That the Court award such other and further relief as the Court deems proper and just.

Dated: August 11, 2017

Respectfully submitted,

*/s/ Stephen McBrady*
Stephen McBrady, Esq.
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
Fax: (202) 628-5116
SMcBrady@crowell.com

*Counsel for HealthNow New York Inc.*

OF COUNSEL:
Daniel Wolff, Esq.
Xavier Baker, Esq.
Jacinta Alves, Esq.
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 11, 2017, a copy of the forgoing complaint was filed

electronically using the Court's Electronic Case Filing (ECF) system.  I understand that notice of

this filing will be served on Defendant's Counsel via the Court's ECF system.

*/s/ Stephen McBrady*
Stephen McBrady, Esq.
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel:  (202) 624-2500
Fax:  (202) 628-5116
SMcBrady@crowell.com
